## FULTON, Respondent, v. CHOUTEAU COUNTY FARMERS' CO. et al., Appellants.

(No. 7,232.)

(Submitted September 25, 1934. Decided November 13, 1934.)

[37 Pac. (2d) 1025.]

50

*Messrs. Clift & Glover,* for Appellants, submitted an original and a reply brief, and argued the cause orally.

52

54

*Mr. W. F. O'Leary, Mr. J. P. Freeman* and *Mr. Donald Campbell,* for Respondent, submitted a brief; *Mr. O'Leary* and *Mr. Freeman* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendants, Chouteau County Farmers' Company, a corporation, and O. A. Tschache, have jointly appealed from a judgment entered against them and in favor of the plaintiff, W. M. Fulton, for personal injuries received when Fulton was struck by an automobile driven by Tschache in the performance of his duties as field manager for the defendant company.

The accident occurred about 7:30 P. M. on September 24, 1931, it being then dark and cloudy, on the "Y. G. B. Line Highway" at a point about 8 miles west of Great Falls. The highway has a hard, black surface 18 feet in width, flanked by graveled shoulders, safe for travel, approximately 4 feet in width, thus giving a driving surface of 26 feet.

Just prior to the accident, W. C. Bunn, while driving east toward Great Falls, had a flat tire; he parked his car at the right-hand side of the highway half on and half off of the hard surface and went to the rear of his car to secure tools. As Fulton approached the Bunn car from the rear, also driving east, he was "disturbed" by the bright headlights of a car approaching from the east; he cut his speed to from 12 to 15 miles per hour and was "intently watching the headlights" when a companion warned him of the Bunn car, then but 12 feet ahead. He swung sharply to the left; simultaneously the approaching car, a truck driven by George Tallman,

passed the Bunn car; thus for an instant the three cars were practically abreast on the highway. In this position the rear fender of the Fulton car "ticked" the rear fender of the Bunn car, and the front fender "ticked" the rear fender of the truck. Fulton stopped his car so quickly that it came to rest with its rear wheels opposite the door of the Bunn coupé, their running-boards practically parallel and but 12 to 16 inches apart. Tallman swung the truck sharply to the right and then to the left, bringing his rear wheels to the outside edge of the shoulder of the road; threw out his clutch and coasted to a stop something like 160 to 200 feet west and to the rear of the doubled parked cars. Thus the entire south half of the highway was blocked — the Fulton car may have extended slightly beyond the center line; but after the passing of the truck there was ample space for cars to pass on the north half of the highway.

Fulton stepped from his car, walked west along the left-hand side thereof and to the rear where he met Bunn; he testified that he did so because he was concerned lest he had struck somebody down fixing a tire; that, looking west, he saw no car but the truck, and no light on the road except that which he thought was thrown from the truck headlights. He further testified that the time elapsing from his alighting from his car until he reached Bunn was but five to seven seconds, and that no words were exchanged between him and Bunn. In this he was corroborated by Bunn and the other occupants of the Fulton car—Goodwin and Mrs. Fulton. Approaching Bunn, Fulton was facing south and did not then look to the west.

While the above scene was being enacted, Tschache was approaching from the west. He testified that, as he neared the truck, he "dimmed" his lights, but that the truck driver did not dim his and that he, Tschache, was also disconcerted by the bright lights of the truck casting their rays in his eyes, as a result of which he did not see what was on the highway ahead of him. It must, however, be remembered that he passed the truck, not as did Fulton, at the place where the Bunn car was parked, but from 160 to 200 feet west thereof. He

did not switch his lights back to their driving radius but continued driving with them "dimmed," which, in his type of car, meant that the lights were as bright as before but the rays were deflected to the roadway, in which position he could see objects perhaps 50 feet distant.

Tschache testified that a black object loomed up before him too late for him to stop or deflect his car, and that he then saw two men behind the parked cars. Two men in the truck testified that the Tschache car was traveling at the rate of 40, or from 40 to 50, miles per hour as it passed them. Tschache himself testified that he did not know how fast he was driving at that time, but introduced evidence to the effect that, owing to defective spark plugs, his car would not go over 30 miles per hour; that on encountering the light from the truck he took his foot from the accelerator and slowed down but, on passing the truck, he "might have hit the accelerator again"; that he could not say whether he was 25, 50, or 100 feet distant when he observed the "black object" ahead of him.

Tschache's car struck Bunn and Fulton, driving them against their respective cars and forcing the Bunn car, with its flat tire, 12 to 15 feet forward, and, with Fulton between, struck the Fulton car such a blow as to wreck the front of the Tschache car and the rear of the Fulton car and drive the latter, with its emergency brake set "two-thirds," a distance of 125 feet along the highway and into the ditch, with Fulton, a mangled leg caught over the bumper, dragging behind.

Fulton was so mangled that the attending surgeon said of him: "I don't recall that I have ever seen a man broken up as he was survive; I think mostly his will power, determination to live, kept him alive." He was in a hospital for more than six months and was then taken home where, for a year or more, he required the constant attendance of nurses and an attendant, and still requires constant attendance. He is a hopeless cripple with steel braces constantly worn from the hips to his heels; he can move but slowly on crutches. The

expense of hospital and nurse hire to the time of trial exceeded $6,000, and his doctor bill was $10,000.

At the time of the accident Fulton was a robust and very active and energetic man of sixty-one years of age, engaged in oil production in this and several other states. He testified that he "opened up" the Pondera field in Montana and conducted his operations through the Fulton Petroleum Company, in which company his duties required him to be on his feet from fourteen to sixteen hours a day; that he received a "nominal" salary of $125 a month from his company, and a like salary from a subsidiary company in Seattle, but that by reason of his activities his income had been from sixteen to eighteen thousand dollars per year, which was lost by reason of his disability.

This action was instituted by the filing of a complaint which charges negligence on twelve grounds, which include the alleged driving at a reckless speed in excess of 50 miles per hour in the night-time, which speed was greater than reasonable and proper under the conditions at the time and place; failing to have defendants' car under proper control; failing to give warning; failing to keep a proper lookout; negligently driving into the plaintiff; failing to have sufficient lights, and driving with lights that were "weak and insufficient" to enable the defendant Tschache to discern objects at a distance sufficient to avoid hitting them while driving at a rate of speed in excess of 50 miles per hour; and "reckless operation" generally. The complaint further alleged that the plaintiff had a right to be on, and was then and there entitled to the use of, the highway, which was unobstructed for a distance of at least 250 feet west of where the plaintiff was standing. The plaintiff prayed for $60,000 general damages, and $16,112 special damages, and for his costs.

The defendants interposed separate answers in which they set up the defense of contributory negligence, alleging that the plaintiff negligently and carelessly stopped his car in the center of the highway so that, with the Bunn car, it "practically blocked" the highway from travel in either direction; that no tail-light was visible on either car; that plaintiff and

Bunn were standing in the road "arguing and quarreling" and failed to look for approaching cars; and that plaintiff's failure to exercise "ordinary care, caution and prudence" directly and proximately contributed to his resulting injuries.

On the trial of the issues so framed, the defendants moved for a nonsuit at the close of plaintiff's case and for a directed verdict at the close of all of the evidence, which motions were denied; the jury was instructed and the issues were submitted to them for consideration. The trial resulted in a verdict for the full amount demanded in the complaint. The defendants moved for a new trial, which was denied; whereupon the defendants jointly perfected this appeal.

The first assignment of error is on the admission in evidence ▊▊ of two photographs of posed cars at the point of collision, purporting to depict the position of the Bunn and Fulton cars at the time they were struck by the Tschache car. It is contended that, as the evidence did not disclose that the posed cars were of the size and type of those figuring in the accident, and as the exact position of the two cars prior to the accident was in controversy, the photographs were inadmissible, and that photographs of posed objects are never admissible in evidence as proof.

As shown by the evidence, there is a slight difference in the width of different makes and types of cars. The Fulton car was 2 inches wider than the Tschache car, and 4 inches wider than the Bunn car, but as shown in the photographs, neither of the posed cars was a large type of car and, if either differed slightly from the width of the cars concerned, the fact could be of little moment in illustrating the opportunity the defendant Tschache had for passing them without mishap.

While the witnesses did not, and could not, describe the position of the two cars before being struck with absolute certainty, there was no controversy among those who were in a position to know of their location, as to their position. True, Tschache testified that both hind wheels of the Bunn car were on the black surface of the highway, but he spoke of its position after he had struck the left rear corner of the car and had driven it 12 to 15 feet ahead.

Of the cases cited by the defendants in support of their contention that the photographs were inadmissible, but one goes so far as to say that a photograph taken after an accident showing the precise position of a party at the time of the accident is inadmissible (*Welch* v. *Louisville & N. R. Co.,* 163 Ky. 103, 173 S. W. 338), this on the ground that it is self-serving and cannot be used to corroborate the witness. This holding was followed in a case wherein the cars and persons involved in an accident were represented on the scene of the accident by other cars and persons, and these photographed. (*Nunnelly's Admr.* v. *Muth,* 195 Ky. 352, 242 S. W. 622, 623, 27 A. L. R. 910.) In this latter case the court cited a former decision (*Bowling Green Gas Light Co.* v. *Dean's Ex'x,* 142 Ky. 678, 134 S. W. 1115), explaining that therein admitted posed photographs "represented conditions as they actually were, and not the theory of one party or the other."

In *Colonial Refining Co.* v. *Lathrop,* 64 Okl. 47, 166 Pac. 747, L. R. A. 1917F, 890, the excluded photographs were of hypothetical situations illustrating the theory of the defendant as to how the plaintiff might have received his injuries.

The remaining case cited by defendants (*Babb* v. *Oxford Paper Co.,* 99 Me. 298, 59 Atl. 290, 292), declares that "the admission of photographs lies largely within the discretion of the presiding justice. He must first be satisfied that the photograph is sufficiently verified, that it is fairly representative of the object portrayed, and that it may be useful to the jury. His determination upon these points is not subject to exceptions. (*Jameson* v. *Weld,* 93 Me. 345, 45 Atl. 299.) To be admissible, photographs should simply show conditions existing at the time in question. But photographs taken to show more than this, with men in various assumed postures, and things in various assumed situations, in order to illustrate the claims and contentions of the parties, should not be admitted." However, photographs stand on the same footing as diagrams, maps, plans, and the like, and, as a general rule, whenever relevant to describe a person, place, or thing, they

are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. (22 C. J. 913, and cases cited; *Stokes* v. *Long,* 52 Mont. 470, 159 Pac. 28.)

While most of the reported cases deal with photographs of fixed or stationary objects, there is no valid reason why, without attempting to stage or reproduce the accident, photographs of objects which contributed to, or were involved in, the accident, or objects representing them, placed to conform to the evidence and then photographed, should not be admitted, if in the opinion of the trial judge they will aid the jury by illustrating the situation in which the actors found themselves placed at the time of the accident. It has been held that photographs of a switch engine and car, placed in their positions at the time of an accident, were properly admitted (*Paden* v. *Rockford Palace Furniture Co.,* 220 Ill. App. 534); likewise it was held not error to admit a photograph of an automobile placed near a fence, in accordance with testimony (*Patrick* v. *Siliskis,* 105 Okl. 51, 222 Pac. 543); and even where the photograph showed sticks of wood placed at the points where the witnesses said the actors in a shooting affray were standing, it has been held admissible in evidence for the purpose of illustration (*People* v. *Lee,* 34 Cal. App. 702, 168 Pac. 694). See, also, *McNair* v. *Berger,* 92 Mont. 441, 15 Pac. (2d) 834; *Johnson* v. *Union Pac. Ry. Co.,* 35 Utah, 285, 100 Pac. 390; *Haven* v. *Snyder,* 93 Ind. App. 54, 176 N. E. 149.

No error was committed in admitting the photographs.

It is urged that the court erred in giving the following ▬▬ instruction: ''You are instructed that a person on the highway and a driver of an automobile have equal rights in the use of public highways, and neither may, with propriety, infringe upon or disregard the rights of the other. The driver of an automobile and a person on a highway are both required to use such reasonable care as the circumstances of the case demand, and an exercise of greater care on the part of each being required where there is an increase of danger.

Each must exercise the right in a reasonable and careful manner so as to cause no unreasonable abridgment of interference with the rights of another." The contention is that the instruction is rendered erroneous by the substitution of the term "person" for that of "pedestrian" in the instruction approved by this court (*Pierce* v. *Safeway Stores,* 93 Mont. 560, 20 Pac. (2d) 253; *Johnson* v. *Herring,* 89 Mont. 156, 295 Pac. 1100; *Autio* v. *Miller,* 92 Mont. 150, 11 Pac. (2d) 1039), and that the purpose for which plaintiff was using the highway was in dispute and became material, as the answer alleges that plaintiff and Bunn were standing in the highway "arguing and quarreling."

The testimony of all persons at the scene of the accident is to the effect that Fulton had not spoken to Bunn, or Bunn to him, at the time they were struck by Tschache's car. Bunn was asked, for the purpose of impeachment, as to whether he had not stated to one Popescu, while in the hospital, that they "were standing there arguing"; his answer was "absolutely no." Popescu testified that he had such a conversation. Bunn was also asked if he did not, on the way to the hospital, tell Tschache, "That fellow came along and hit me and he came back and was arguing with me and I thought he was going to hit me, and I was watching him and that is why I did not see you." He denied that he made such statement. Tschache testified that Bunn so stated at the time.

In like manner it was sought to impeach the witness Goodwin with reference to a purported statement to one C. G. Robinson that Fulton apparently went back to talk with Bunn, and that "they were talking there standing 4 or 5 feet apart," denied by Goodwin and affirmed by Robinson.

Even if, in this manner, the defendants could be said to have shown that Fulton and Bunn were "arguing and quarreling" on the highway, the proof would not establish an unlawful use of the highway, for, if there was any talking done, it could have occupied but an infinitesimal period of time, as the crash came at practically the instant Fulton reached the rear of his car.

64

The above rule as to the equal rights of *pedestrians* and drivers of automobiles on the highway applies also to other *persons* lawfully using the highway (2 R. C. L. 1184); it has equal application, for example, to bicyclists (*Pratt* v. *Kistler*, 72 Mont. 356, 233 Pac. 600) and to motorcyclists (*Marsh* v. *Ayers*, 80 Mont. 401, 260 Pac. 702). The driver of an automobile certainly, in case of a breakdown, a collision, or other accident, if he exercises reasonable care, may use the highway for the purpose of inspection, or repair in case his car is unable to proceed, or may render assistance to another on the highway. While the chief use of a highway is travel, these activities constitute a proper use thereof, and the operators of motor vehicles on the highway are bound to exercise reasonable care to avoid injury to persons working on or about vehicles standing on the highway, even though such persons have placed themselves in a dangerous position. (42 C. J. 1041, and cases cited; 1 Blashfield's Ency. of Auto Law, 556.) The right to stop when the occasion demands it is an incident to the right to travel the highway. (*Morton* v. *Mooney*, 97 Mont. 1, 33 Pac. (2d) 262.)

At the time of the accident the plaintiff could not be said to be the "driver of an automobile"; nor was he a "pedestrian"; he was not a trespasser on the highway, but a "person" making a proper use of the highway. (*Reynolds* v. *Murphy*, 241 Mass. 225, 135 N. E. 116; *Shearer* v. *Puent*, 166 Minn. 425, 208 N. W. 182.) The law imposes upon all "persons" using a highway the obligation to exercise ordinary care to avoid inflicting injury upon others. (*Jones* v. *Northwestern Auto Supply Co.*, 93 Mont. 224, 18 Pac. (2d) 305.)

The challenged instruction is not vulnerable to the attack made upon it; the court was justified in altering the rule heretofore approved, by changing the term or designation "pedestrian" to "person" in order to render the instruction understandable and in accordance with the facts of the particular case.

The defendants assert that the court erred in instructing the jury that "it is the duty of the driver of an auto-

mobile to keep his car under reasonable control,'' instead of saying that such duty is to use reasonable care to keep his car under control, and that thereby the court made the defendants insurers, contrary to law. We do not so view the instruction; there is little actual difference in the two phrases, and the court in the remainder of the instruction carefully advised the jury as to the burden imposed by the duty declared and what exactly is meant by "reasonable control.'' The instruction is in conformity with the authorities on the subject (Huddy on Automobiles, 8th ed., 433; 42 C. J. 920; see *McNair* v. *Berger*, above); it does not declare the driver an insurer, but places upon such a one the burden of exercising reasonable care in the circumstances, and is not open to the attack made upon it.

Specifications 2 and 3 assert error in refusing to grant a nonsuit or an instructed verdict on the ground that "the plaintiff is guilty of contributory negligence as a matter of law"; while specification No. 6 is to the effect that the verdict is contrary to, and in violation of, the court's instructions on the subject of contributory negligence.

The instructions on the subject are to the effect that, if the lights of the approaching Tschache car were plainly to be seen, had the plaintiff looked, he will be presumed to have seen them, and if he, nevertheless, alighted from his car "and walked into the path of this approaching automobile, plaintiff was guilty of contributory negligence and cannot recover''; and that one who alights from an automobile upon a busy highway in the portion ordinarily traveled by vehicles is bound vigilantly to use his senses of sight and hearing "to determine whether a motor vehicle is approaching, through the operation of which he may be endangered''; and if the evidence discloses that the plaintiff did not do so "and as a result failed to discover the approaching automobile * * * in time to move to a place of safety, then the plaintiff was guilty of contributory negligence and cannot recover.''

The question here raised is a close one and requires a careful consideration and application of the rule that contributory

negligence bars recovery, for it is not enough to show that the plaintiff was negligent but, to bar a recovery, such negligence must have directly contributed to the injury at the time it was inflicted; it must have been a proximate cause of the injury. (*Neary* v. *Northern Pac. Ry. Co.*, 41 Mont. 480, 110 Pac. 226; *Daniels* v. *Granite Bi-Metallic Con. Min. Co.*, 56 Mont. 284, 184 Pac. 836.)

The rule is based on right and justice between the parties, but it is difficult of application and attempts to apply it as a rigid measuring stick have often resulted in injustice. Much confusion is found both in the decisions and in the declarations of text-writers, not only as to the reason for the rule but as to its application in given cases.

It is said that the rule is based upon public policy founded on the inability of human tribunals to mete out exact justice; that it arose from the impossibility to apportion damages between parties both of whom are at fault; because the defendant's negligence is not the cause of the injury if plaintiff's negligence contributed to it (Beach on Contributory Negligence, 2d ed., 13); that by the interposition of plaintiff's independent will the causal connection between the defendant's negligence and the injury is broken (Wharton on Negligence, sec. 300). Each of these statements seems to have been criticised.

The rule was first granted on the English law by Lord Ellensborough, C. J., in *Butterfield* v. *Forrester*, 11 East, 60, from the Civil Law of Imperial Rome (Beach, above, 1), and followed by *Davies* v. *Munn*, (10 Mees. & W. 546) 10 L. J. (Exch.) 10, and *Tuff* v. *Worman*, 26 L. J. C. P. 263 (n. s.) 573, established the English rule, which is that ''a person is not entitled to say that he is injured by the negligence of another if he might, by the use of ordinary care, have escaped the damage. But, although a plaintiff has brought himself into danger by negligence, if the defendant could by ordinary care have averted the danger, he is liable.'' (19 Eng. Rul. Cas. 189.) This rule seems to incorporate therein our doctrine of ''the last clear chance,'' but is based, for its application, upon a determination of what constitutes a proximate

cause of the injury. This rule was early established in this country. The very essence of contributory negligence is a want of ordinary care on the part of the plaintiff which is *a proximate cause,* an occasion, of the injury; not only must the negligence of one injured by the culpable negligence of another contribute to the injury, but it must contribute as a proximate cause, and not as a remote cause. (*Harrison* v. *Berkley,* 1 Strob. (S. C.) 525, 47 Am. Dec. 578; *Fairbanks* v. *Kerr,* 70 Pa. 86, 10 Am. Rep. 664; *Cummins* v. *Spruance,* 4 Harr. (Del.) 315; *Kennard* v. *Burton,* 25 Me. 39, 43 Am. Dec. 249; *Daley* v. *Norwich Ry. Co.,* 26 Conn. 591, 68 Am. Dec. 413; *Grippen* v. *New York Cent. Ry. Co.,* 40 N. Y. 34; *Glenn* v. *Columbia etc. Ry. Co.,* 21 S. C. 466.)

In formulating the doctrine of proximate cause in this country and in conformity with the English rule, it is declared that "if the negligence of the plaintiff being only a remote cause, the defendant might have avoided inflicting the injury by the exercise of ordinary care, the action for damages is maintainable. In such a case the defendant's negligence is the proximate cause and he is liable." (Beach on Contributory Negligence, 2d ed., 31, citing *Day* v. *Crossman,* 1 Hun (N. Y.), 570, 4 Thomp. & C. 122, *Doggett* v. *Richmond etc. Ry.,* 78 N. C. 305, *Schierhold* v. *North Beach & M. Ry. Co.,* 40 Cal. 447, *Zimmerman* v. *Hannibal & St. J. Ry. Co.,* 71 Mo. 476, and many additional cases in support of the text.) Or, as stated by Shearman & Redfield on Negligence, 3d ed., 27, one who is injured by the negligence of another cannot recover for the injury if he, by his own negligence, "proximately contributed to produce the injury of which he complains, so that, but for his concurring and co-operating fault, the injury would not have happened to him, except where the more proximate cause of the injury is the omission of the other party, after becoming aware of the danger to which the former party is exposed, to use a proper degree of care to avoid injuring him."

These rules are followed in the well-considered decisions and have been invoked to sustain judgments in spite of a show-

ing of negligence on the part of the plaintiff in cases similar to the case before us, as reported. (*Shearer* v. *Dewees,* 151 Minn. 380, 186 N. W. 793; *Shearer* v. *Puent,* above; *Deitchler* v. *Ball,* 99 Wash. 483, 170 Pac. 123, 124; *Stapp* v. *Madera Canal & Irr. Co.,* 34 Cal. App. 51, 166 Pac. 823; *Coffman* v. *Singh,* 49 Cal. App. 342, 193 Pac. 259; *White* v. *Davis,* 103 Cal. App. 531, 284 Pac. 1086; *Humes* v. *Schaller,* 39 R. I. 519, 99 Atl. 55, L. R. A. 1917B, 316; *Milligan* v. *Clogston,* 100 Vt. 455, 138 Atl. 739; *Doerr* v. *Woodland Trans. Co.,* 105 Conn. 689, 136 Atl. 693; *Parlongue* v. *Leon,* 6 La. App. 18; *Benson* v. *Brady,* 135 Atl. 343, 5 N. J. Misc. 13; *Roberts* v. *Freihofer Baking Co.,* 283 Pa. 573, 129 Atl. 574; *Stanley* v. *Tomlin,* 143 Va. 187, 129 S. E. 379. See, also, Shearman & Redfield on Negligence, sec. 89; 2 R. C. L. 1184; annotations, 25 A. L. R. 134; 34 A. L. R. 1513; 61 A. L. R. 1159.)

The test as to contributory negligence on the part of plaintiff in such a case as this, is, Did he, or did he not, in the circumstances, act as would an ordinarily prudent man? This question, with that of proximate cause and, consequently, contributory negligence, is ordinarily for the jury (*Atkinson* v. *Goodrich Trans. Co.,* 60 Wis. 141, 18 N. W. 764, 50 Am. Rep. 352; *Coffman* v. *Singh,* above; *White* v. *Davis,* above; *Shearer* v. *Dewees,* above; *Wise* v. *Stagg,* 94 Mont. 321, 22 Pac. (2d) 308); and it has been said that where the plaintiff had a verdict notwithstanding his negligence, it was supported on the theory that the jury did not consider it the proximate cause. (*Brown* v. *Cent. Pac. Ry. Co.,* 2 Cal. Unrep. 730, 12 Pac. 512.)

Contributory negligence is a question of law only when the evidence is of such a character that it will support no other legitimate inference, and even where the facts are undisputed, if reasonable minds might draw different conclusions upon the question and from the evidence, the question is one for the jury. (*White* v. *Davis,* above; see *Autio* v. *Miller,* 92 Mont. 150, 11 Pac. (2d) 1039, 1045; *Childers* v. *Deschamps,* 87 Mont. 505, 290 Pac. 261.)

In the case of *Deitchler* v. *Ball,* above, in which the facts are very much like in the instant case, as the plaintiff had stopped his car on the highway to put up the top, and two other cars stopped at the same time, where an on-coming car ran into plaintiff and injured him, in the night-time, while he was standing close to his car on which the lights were shining, the supreme court of Washington said that, although the plaintiff "paid no attention to what was going on about him," he had a right to stop where he did and to occupy a portion of the highway, and standing close to his own car he was required to use "ordinarily reasonable care for his safety" while doing what was necessary to be done on his car, and "it was the duty of persons coming up to him to so control their cars as not to injure him, especially where there was room to avoid injury as there evidently was in this case." Like expressions are found in a number of the cases cited above. In other words, "reasonable care" does not require a person, situated as was the plaintiff in this and the cases cited, to anticipate that the driver of an on-coming car will not see that which is plainly before him, or drive with his car so out of control that he cannot stop when he does see the obstruction, or person, in the line of his travel, when, ordinarily, he would have plenty of time and space within which to avoid the injury.

It cannot be said that an ordinarily prudent man would apprehend that, under the fact conditions shown, he, in Fulton's position, was in danger from on-coming cars and should have kept his eyes on the road, and, on seeing an approaching car, should have left the road in the belief that the driver of such car would not deviate from his course although that course was blocked by two cars and there was ample room to pass to the left of them.

As to the instructions on the subject and the charge that the verdict is contrary thereto, the plaintiff did not walk "into the path of this approaching automobile," as a reasonably prudent man would see that path, which would be to the left of the Fulton car. Where a person does "walk into" the line of travel of an on-coming car without looking to see

whether or not he is stepping into danger, his want of ordinary care and prudence is held to constitute contributory negligence as a matter of law (*Mayer* v. *Anderson*, 36 Cal. App. 740, 173 Pac. 174; *Moss* v. *H. R. Boynton Co.*, 44 Cal. App. 474, 186 Pac. 631; *Ogden* v. *Lee*, 61 Cal. App. 493, 215 Pac. 122), but where a person is stationary on the highway, engaged in some legitimate enterprise, the question is one for determination by the jury (*White* v. *Davis*, above).

The second instruction is based upon the premise that a person in Fulton's position must use his senses to determine whether a car is approaching ''through the operation of which he may be endangered,'' and it is then said that if he failed to do so ''in time to move to a place of safety,'' he was guilty of contributory negligence. Under the rules above noted and under the evidence, a reasonably prudent man would be justified in believing he was ''in a place of safety'' up to the moment of impact, for he would be justified in assuming that the driver would see the parked cars with their lights on, and would pass to the left of them.

The court did not err in refusing to take the case from the jury, nor is the verdict so contrary to the instructions as to make it ''against law.''

Finally it is contended that ''the verdict is excessive, appearing to have been given under the influence of passion or prejudice.''

This question has always been embarrassing to the court. Strictly speaking, it can only be presented to the trial court as a ground for a new trial (sec. 9397, Rev. Codes 1921), and is presented to this court on the charge that the trial court erred in denying the defendants a new trial.

Where the conclusion is irresistible that the amount of the verdict was the result of the passion and prejudice of the jury, it becomes the duty of the court to set the verdict aside (*DeCelles* v. *Casey*, 48 Mont. 568, 139 Pac. 586); but nowhere in the law is there warrant for reducing the amount and affirming the judgment; this court has no such power. (*Ken-*

*non* v. *Gilmer*, 5 Mont. 257, 5 Pac. 847, 51 Am. Rep. 45; Id., 131 U. S. 22, 9 Sup. Ct. 696, 33 L. Ed. 110.)

However, the action of the trial court, and of the supreme court, taken to save the trouble and expense of a new trial, in scaling an excessive verdict and requiring the plaintiff to accept the lesser amount, or suffer a new trial, has been sanctioned both by this court and by the supreme court of the United States. (*Kennon* v. *Gilmer*, above.) This court has, on occasion, exercised this prerogative; twice recently in automobile accident cases. In the first of these (*Wise* v. *Stagg*, above), it appeared that the plaintiff did not sustain serious injuries, and the only permanent results of the accident were certain superficial scars which did not, apparently, detract greatly from her personal appearance. The verdict was scaled from $6,500 to $4,000, which amount was accepted by the plaintiff. In the second (*Tanner* v. *Smith*, 97 Mont. 229, 33 Pac. (2d) 547), the record disclosed that the plaintiff's injury consisted of an enlargement of a hernia already existing, causing increased suffering, and curtailing her activities; the verdict for $10,000 was scaled to $7,500, which was also accepted by the plaintiff. In each of these cases the record showed extrinsic matters which might easily create prejudice against the defendant and appeal to or arouse the passion of the jurors, and this fact, coupled with the size of the verdict viewed in the light of the injuries shown to have been received, and the condition of the injured party at the time of the trial, convinced the majority of this court that a new trial could be granted on the ground here urged. The court therefore scaled the verdicts in order to do justice between the parties and to obviate the necessity of a new trial.

In the case at bar there are no extrinsic matters disclosed in the evidence to appeal to the passion and prejudice of the jurors, and the only ground for the charge that the verdict is excessive is the size thereof. This verdict for $76,112 is, perhaps, the largest ever rendered in a personal injury case in this state, but in order to determine whether or not the size of the verdict shocks the conscience of the members of

this court, we must carefully consider the elements of damage taken into consideration by the jury in arriving at their verdict. No record ever presented to this court in a personal injury case shows conditions justifying a large award in anywise comparable to the showing here made.

First, we have undisputed proof of the payment by the plaintiff of $6,112 for hospital charges and nurse hire over a period of a year and a half, the reasonableness of which is not questioned. Next there is the charge for the services of the physician and surgeon, over the same period, of $10,000, which is said to be a reasonable charge for the services rendered. The defendants attempted to show the unreasonableness of this latter charge by showing the amount the doctor would be allowed under the Workmen's Compensation Act. This evidence furnished no criterion for determination in such a case as this. The Act merely provides industrial insurance, and, as this court has often indicated, it does not attempt fully to compensate an injured workman, but provides a maximum compensation for total disability; it likewise fixes a maximum allowance for "medical, surgical and hospital service and medicines" of $500 (Chap. 177, Laws of 1929, sec. 15), but there can be no contention that this amount fixes the reasonable charge for such services in all cases, based on the services rendered, or that it is controlling, or even persuasive, in cases other than those arising under the Act.

On the record we cannot but hold that the plaintiff established his right to recover the sum of $16,112 as the reasonable expenses incurred in connection with, and as a result of, his injuries.

Next it is shown that plaintiff was earning a salary of $3,000 per year, and that his earning capacity was wholly destroyed. Taking this evidence and the showing of his life expectancy and the cost of an annuity which would furnish him with that income for such expectancy (see *Bourke* v. *Butte Elec. & Power Co.*, 33 Mont. 267, 83 Pac. 170) as a basis, counsel for the defendants compute the proper award for the injuries at $32,896.50. Thus we have items which

cannot be successfully attacked here, totaling approximately $49,000.

But plaintiff's testimony is to the effect that his salaries in his two companies were but a "nominal salary," his annual income, due to his energetic management of his companies, amounting to from $16,000 to $18,000, all of which was lost to him by reason of his total disability and the failure of others to keep the several business enterprises in the condition in which he left them. Assuming that the additional income from $12,000 to $15,000 be considered as speculative and uncertain and that the evidence does not show that plaintiff's disability caused the loss of profit through the business operations of the companies, we still have the important element of compensation for pain and suffering.

Space does not permit the cataloging of his many injuries; he was so "broken" that the surgeon marveled that he survived; he suffered intense pain for months; suffered so greatly that the surgeon was forced frequently to relax the treatment undertaken to restore his body to a semblance of its normal condition; his legs are practically useless, and it is probable that he will yet have to have one of them amputated.

Had the plaintiff been killed outright, the evidence would justify a verdict in favor of his wife for the $32,896.50 mentioned above, and such additional amount as the jury might deem compensation for loss of earnings over and above plaintiff's "nominal" salary; to this "broken man" the jury awarded an additional sum of approximately $27,000, which may have been partially for such additional loss of earnings, or may have been solely for pain and suffering. Who can say that such action was the result of passion and prejudice? The trial court, by overruling the motion for a new trial, said that such was not the case. The trial judge, with the jury, sat through the recital of the harrowing details of the accident and the long drawn out campaign to rehabilitate, so far as possible, the wreck of a human being left by the accident; saw plaintiff's condition and was able to understand,

in some measure, the agony and suffering through which he had passed. The judge was in a much more advantageous position than are we to determine whether or not the verdict was the result of passion and prejudice.

We must bear in mind that, in this class of cases, "there is no fixed measuring stick by which to determine the amount of damages, other than the intelligence of the jury" (*McNair* v. *Berger*, 92 Mont. 441, 15 Pac. (2d) 834, 839), to whom, of necessity, is allowed a wide latitude, and "so long as we have a system which confides to juries the duty to determine the issues involved in this character of cases and to fix the amount of compensation to be paid, unless the result of their deliberation is such as to shock the conscience and understanding, it must be accepted as conclusive" (*Autio* v. *Miller*, above); "this court will not substitute its judgment for that of the jury, especially where, as here, the trial court has approved the verdict by denying the motion for a new trial" (*McNair* v. *Berger*, above. See, also, *Brown* v. *Columbia Amusement Co.*, 91 Mont. 174, 6 Pac. (2d) 874; *Staff* v. *Montana Petroleum Co.*, 88 Mont. 145, 291 Pac. 1042; *Puutio* v. *Roman*, 79 Mont. 226, 255 Pac. 730.)

When we consider, as the trial judge must have when this matter was presented to him, what the plaintiff was before the accident, with his rosy prospects for a competency in his approaching age, compared with his present condition mentally, physically, and financially, brought about by the accident, we cannot say that the jury was motivated by passion and prejudice in returning its verdict, large though it is, or that the trial court manifestly abused its discretion in refusing to set that verdict aside and grant a new trial, either absolute or conditional on the refusal of the plaintiff to accept a lesser amount than the triers of fact held would compensate him for his injuries, and therefore we must decline to scale the verdict.

Judgment affirmed.

Mr. Chief Justice Callaway and Associate Justices Stewart and Anderson concur.

Mr. Justice Angstman: I concur in the result reached in the foregoing opinion, but not with all that is stated in it. With reference to what is therein said in an attempt to bolster the majority opinions in the cases of *Wise* v. *Stagg*, 94 Mont. 321, 22 Pac. (2d) 308, and *Tanner* v. *Smith*, 97 Mont. 229, 33 Pac. (2d) 547, my views are sufficiently set forth in the dissenting opinions in those cases.

So far as the foregoing opinion attempts to distinguish this case from the *Wise* and *Tanner Cases*, because of the presence or absence of extrinsic matters, aside from the size of the verdict, which might ·create prejudice or appeal to the passion of the jurors, I disagree with it. In determining whether a verdict is excessive, the only elements that must be considered are the size of the verdict and the extent of the injuries and damage. If the verdict is out of proportion to the injuries inflicted and the damages sustained to an extent so as to shock the conscience, it is excessive and must be said, as a matter of law, to rest upon passion and prejudice, whether or not there be evidence of extrinsic facts showing passion or prejudice. If it is not out of proportion to the injury and damage, it is of no moment that there may have been extrinsic facts which might easily have caused passion or prejudice.

Instead of attempting to draw a refined distinction between this and the *Wise* and *Tanner Cases*—a distinction so indistinct and shadowy that lawyers and district judges cannot follow it as a guide in future cases—the majority opinions in the *Wise* and *Tanner Cases*, for the sake of consistency, should now be pronounced erroneous so far as they compelled a reduction of the verdict and judgment.